## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**JERRON TAYLOR**                                                      **PLAINTIFF**
**Reg. #32444-009**

**v.**                              **No: 4:22-cv-01257-PSH**

**CIGI SCOTT**                                                          **DEFENDANT**

## MEMORANDUM AND ORDER

### I. Introduction

Plaintiff Jerron Taylor filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 on December 19, 2022, and an amended complaint on January 17, 2023 (Doc. Nos. 2 & 4). Taylor sues Lieutenant Cigi Scott in both her official and individual capacities. He alleges that Scott was deliberately indifferent to his serious medical needs while he was incarcerated as a pre-trial detainee at the Pulaski County Regional Detention Facility.[1] Doc. No. 4 at 5-9. Specifically, he claims that Scott did not allow him to wear medically appropriate shoes. *Id.* Taylor alleged he was mostly confined to a wheelchair, had no feeling in his left leg from his knee to his foot, that the jail-issued slide-on shoes would not stay on, and that the shoes he had

---

[1] Taylor is currently incarcerated in the Forrest City Medium Federal Correctional Institution. *See* Doc. No. 27.

in his personal property were appropriate for his condition and muscle loss.  *Id.* at 4-6. He alleged that he obtained a prescription to wear his own shoes, but Scott did not allow him to have them.  *Id.* at 7.  Taylor alleged that Scott directed he receive a pair of military style "Bob Barker" boots instead, which were too heavy for him to wear. *Id.* at 7-8.

Before the Court is a motion for summary judgment, brief in support, and statement of undisputed facts filed by Scott (Doc. Nos. 32-24).  Taylor was notified of his opportunity to file a response and a separate statement of facts (Doc. No. 36). He did not do so.  Because Taylor failed to controvert the facts set forth in Scott's statement of facts, Doc. No. 34, those facts are deemed admitted.  *See* Local Rule 56.1(c).  Scott's statement of facts, and the other pleadings and exhibits in the record, establish that the material facts are not in dispute, and she is entitled to judgment as a matter of law.

## II.  Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986).  When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party.  *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir.

2002).   The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial.  *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007).   The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.   *Id.* (citations omitted).   An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .".  Fed. R. Civ. P. 56(c)(1)(A).  A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012).  Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment.  *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

## III.  Facts

In support of her motion for summary judgment, Scott submitted a statement of facts (Doc. No. 34) with the following documentary evidence: an affidavit by Pulaski County Sergeant James Hill (Doc. No. 34-1); Taylor's arrest and booking information (Doc. No. 34-2); Taylor's requests and grievances (Doc. No. 34-3); Taylor's medical file (Doc. No. 34-4); certain medical policies of the Pulaski County Regional Detention Facility (Doc. No. 34-5); Scott's affidavit (Doc. No. 34-6); and Taylor's discovery responses (Doc. No. 34-7).

Having reviewed Scott's statement of facts, and the other pleadings and exhibits, the Court finds the following material facts to be undisputed.[2]

### *Taylor's Incarceration at the PCRDF and Relevant Medical Treatment and Grievances*

On August 20, 2022, Taylor was booked into the Pulaski County Regional Detention Facility ("PCRDF").  Doc. No. 34-2 at 1, *Arrest and Booking*.  Taylor remained in the custody of PCRDF until June 22, 2023, when he was released to the custody of the United States Marshals Service.  *Id.* at 2.

On August 21, 2022, Turn Key Health medical personnel Amber Samaniego conducted Taylor's medical intake, noting: "unstable gait (PT DRAGGING LEFT

---

[2] All documents are transcribed verbatim without any corrections for misspellings or mistakes.

FOOT STATES HE HAS DROP FOOT).”  Doc. No. 34-4, *Medical Records*, at 3-4.

On August 30, 2022, Turn Key Health medical personnel Austin Michael noted Taylor’s musculoskeletal and neuro history: “Gait unsteady (Pt suffered gun shot wound and bullet remains in his spine. Pt also suffers from Neurological damage to his left lower extremity from his knee down and ‘foot drop’ on his left foot).” Doc. No. 34-4, *Medical Records*, at 6.  Michael also noted Taylor’s mobility: “Non-ambulatory (Wheel Chair for mobility. Neurological damage of left lower extremity and Left ‘drop foot’).”  *Id.* at 7.

On August 30, 2022, Turn Key Health medical personnel Lauren Messersmith submitted a housing accommodation request for Taylor to be placed on a bottom tier and bottom bunk and also noted that Taylor used a wheelchair and had prescribed orthopedic shoes in his property that he needed for safety.  Doc. No. 34-4, *Medical Records*, at 14.  She also submitted a provider note, stating:  “Patient sustained a GSW 2011 to his spine and was paralyzed until 2016. In 2016, his legs began to move again and started to learn to walk again. He normally wears prescribed orthopedic shoes due to L foot drop.”  *Id.* at 23.  Messersmith also noted that Taylor would benefit from orthopedic shoes and a cane.  *Id.*

On September 1, 2022, Turn Key Health medical personnel Christina Whitney submitted a medical chart note, stating: “Per inmate services, pt. has a pair of Jordans

in his property with no orthopedic inserts. Pt. can not have the shoes in his property."

Doc. No. 34-4, *Medical Records,* at 68.

On September 13, 2022, Taylor requested pain medication and a seat cushion for his wheelchair. Doc. No. 34-4, *Medical Records,* at 71. He made a similar request again on September 19, 2022. *Id.* at 72.

On September 22, 2022, Plaintiff submitted a sick call request, stating:

I NEED MY GABAPENITIN ITS WHAT MY DOCTOR PRESCRIBES ME AND IS EFFECTIVE FOR MY NEUROPATHY I TAKE 600MG 4 TIMES A DAY AND MY PHARMACY IS BAPTIST MEDICAL ROWERS MY LEGS ARE GETTING WEAK IN THIS WHEELCHAIR I JUST STARED BACK WALKING ON MY OWN. THE JORDANS THAT I HAVE APPROVED OF THE FOR ME TO WALK IN,I DON'T HAVE MONEY TO BUY BRAND NEW SHOES IN HERE,CAN YOU PLEASE PLEASE MAKE AN EXCEPTION FOR MY SHOES SO I CAN WALK AND WHO AM I SUPPOSED TO ASK ABOUT THE SEAT CUSHION WHICH NURSE?"

Doc. No. 34-4, *Medical Records,* at 73. Medical personnel noted on the request: "Seat cushion at home; Gab. 600mg 8 hrs; 8/10 pain-bullet in spine; [and] all white?" *Id.*

On September 23, 2022, Turn Key Health medical personnel Stephanie Schuller submitted a medical classification communication form, stating: "May have shoes from property if approved." Doc. No. 34-4, *Medical Records,* at 74.

On October 15, 2022, Taylor submitted a medical sick call request asking to see a doctor about the bullet in his spine. Doc. No. 34-4, *Medical Records,* at 75.

Turn Key Health medical personnel Nichole Moore responded: "You are scheduled." Medical personnel also noted: "Wants neurontin increased states he normally takes 400 qid; wants shoes out of personal belongings; see N.N." *Id.* The same day, Turn Key Health medical personnel Connie Blevins submitted a medical chart note, stating:

> States that he normally takes Gabapentin 400 mg qid. Is wanting to know if you would consider increasing his dosage. I have explained that we only do bid. He understands. Also wants to know if he may have his tennis shoes from his personal belongings so that he my [sic] get out of the w/c he's in.

*Id.* at 66-67.

On October 21, 2022, Taylor submitted a sick call request, stating: "OK IM TRYING TO SEE WHAT HAPPENED OR WHAT IS THE OUTCOME OF THE VISIT WITH MS. BLEVINS WILL I GET A CHANCE TO SEE THE DOCTOR OR WAS I CHARGED FOR NOTHING BECAUSE NOTHING WAS CHANGED???" Doc. No. 34-4, *Medical Records,* at 76. Schuller responded: "I will speak with the provider today and see what she wants to be done. shoes have to be velcro in order for you to have them. this is effective on 10/11/22." *Id.*

The same day, Taylor submitted another sick call request, stating:

> MY SHOES DO HAVE VELCRO MINUS THE SHOE STRINGS. ME AND MS.BLEVINSS DISCUSSED THIS LAST VISIT. SHE ALSO KNOWS I JUST START RECENTLY WALKING AND THAT NOW THAT I'M BOUND TO THIS WHEELCHAIR I'M LOSING MUSCLE MASS IN MY LEFT LEG, I REALLY NEED TO

SEE THE DOCTOR ASAP BECAUSE I DON'T HAVE MONEY
FOR NEW SHOES.

Doc. No. 34-4, *Medical Records,* at 77. Turn Key Health medical personnel Anna
McElcraft responded: "Will ask provider. Thank you." *Id.* Medical personnel noted
on the request: "Scheduled to see provider on 10/24/22." *Id.*

On October 22, 2022, Taylor submitted a grievance, #29678467, stating:

I BEEN TRYING TO GET MY SOFT-SOLE SHOES SINCE THE
DAY I GOT HERE ON AUG.20 ,2022. THE MEDICAL PROVIDER
ISSUED ME A SCRIPT ON OCT. 3.2022 TO GET MY SHOES OUT
OF MY PROPERTY PUT NO ONE HAS BROUGHT THEM TO ME
YET. I CAN'T KEEP THESE BROWN SHOWER SHOES TO STAY
ON MY FEET IN THIS WHEELCHAIR AND I'M LOSING
MUSCLE MASS IN MY LEFT LEG BECAUSE I CAN'T GET UP
AND MOVE AROUND WITHOUT THEM FALLING OFF MY
FEET. MY SHOES ARE ALL WHITE AND HAS VELCRO STRAPS
ON THEM. I DON'T EVEN NEED THE SHOE LACES. YOU CAN
TAKE THEM OUT AND PUT THEM IN MY PROPERTY. NOT
BEING ABLE TO WEAR MY SHOES SO I CAN MOVE AROUND
SOME IS CAUSING MY NERVE TO BE WORSE ALL THE TIME.
MY DOCTOR IN THE WORLD ALSO APPROVED THESE SHOES
FOR ME TO WALK IN BECAUSE THEY HAVE GOOD ANKLE
SUPPORT. I DON'T HAVE NO EXTRA MONEY IN HERE TO
BUY NO NEW BALANCE AND NOBODY TO BRING THEM TO
ME ANYWAY. I NEED MY SHOES.

Doc. No. 34-3, *Requests and Grievances,* at 1. The grievance was assigned to Kristin
McCann for investigation. *Id.* On October 24, 2022, Inmate Services Clerk Latoya
Hillard responded: "We have not gotten anything from medical stating that you can
have them. If your shoes got [sic] laces, they will be denied. You are only allowed
to wear velcro orthopedic shoes white or black." *Id.*

Taylor was examined by Messersmith for complaints of "continued pain and issues with ambulating due to foot drop" on October 24, 2022. Doc. No. 34-4, *Medical Records,* at 25-26. Messersmith submitted a provider note, stating: "He reports that he has L foot drop and is unable to walk due to not having supportive shoes. He sustained a GSW in 2011 to his spine that has left him with several deficits. He has continued pain despite gabapentin BID." *Id.* She increased his pain medication and noted he would be referred to Snell for an "appropriate brace." *Id.*

The same day, Messersmith submitted a health services request to the Arkansas Department of Corrections (ADC), requesting an appointment with Snell Prosethics, stating:

> Patient with h/o GSW that resulted in R foot drop. Patient unable to ambulate safely and would benefit from a supportive brace specific to peroneal nerve injuries. He has severe atrophy of his bilateral lower extremities due to not ambulating due to his foot drop. The brace will help regain muscle to help him long-term.

Doc. No. 34-4, *Medical Records,* at 78. On behalf of the ADC, Shelly Byer asked for more documentation and noted the request was "non-emergent." *Id.* at 79.

On October 26, 2022, Schuller submitted a housing accommodation, stating: "May have shoes." Doc. No. 34-4, *Medical Records,* at 21.

On October 28, 2022, Taylor submitted a grievance, #29747959, stating:

ON OCTOBER 28, 2022 NURSE SCHULER RESPONDED TO MY MEDICAL REQUEST AND SAID SHE SENT THE MEDICAL AUTHORIZATION FORM TO YALL TO LET ME GET MY

SHOES. CAN I PLEASE GET MY SHOES TO REDUCE MY PAIN LEVEL FROM OUT OF MY PROPERTY?

Doc. No. 34-3, *Requests and Grievances,* at 2. The grievance was assigned to McCann for investigation. *Id.* On October 31, 2022, Hillard responded: "We have not gotten a medical communication form for you and if they got shoestrings and are not velcro, they will be denied." *Id.*

On October 31, 2022, Taylor submitted a grievance, #29774264, stating: "THE SHOES IN MY PROPERTY DO HAVE VELCRO AND THE SHOE STRINGS CAN BE LEFT IN MY PROPERTY BUT MY SHOES DON'T HAVE TO HAVE THE SHOE STRINGS." Doc. No. 34-3, *Requests and Grievances,* at 3. The grievance was assigned to Kristin McCann for investigation and then marked closed by Taylor the same day. *Id.*

On November 2, 2022, Messersmith submitted a medical chart note, stating:

Spoke with housing Srg on 11/1. She stated that since his shoes were Jordans and had laces, he would be unable to have them. I was notified that ADC denied his request for braces/shoes via Snell. I notified our admin to see if there was a different shoe the facility could provide.

Doc. No. 34-4, *Medical Records,* at 69.

On November 4, 2022, Turn Key Health medical personnel Bertha Lowe submitted a medical chart note, stating: "Spoke with O&S Lt concerning the attempt to provide patient with boots. According to Sgt, patient refused boots. Stated they were too heavy." Doc. No. 34-4, *Medical Records,* at 69.

On November 7, 2022, Taylor submitted a grievance, #29859092, stating:

WELL HELL I GIVE UP YA'LL REALLY DON'T WANT TO SEE
ME WALKING WITHOUT DRAGGING MY LEG ALL AROUND
THE UNIT I GUESS IT'S FUNNY TO YA'LL BUT I'M SO
SERIOUS ABOUT MY WALKING CONDITION. I THOUGHT
THAT THIS WOULD NOT BE SUCH A MAJOR ISSUE TO GET
MY SHOES BECAUSE THEY FIT THE DESCRIPTION OF YOUR
POLICY. THEN THE POLICY CHANGES EVERYTIME. LIKE I
EXPLAINED THAT I DON'T HAVE THE MONEY TO BUY NEW
SHOES BUT THIS IS WHAT I DON'T UNDERSTAND IS IF YOUR
POLICY IS SUPPOSED TO BE WHITE/BLACK WITH VELCRO
AND NO LACES WHY WOULD YOU SEND ME SOME 15 POUND
BOOTS WITH LACES AND NO VELCRO THAT'S
UNBELIEVABLE. NOW THAT'S CRAZY ANYWAY WHO AM I...

Doc. No. 34-4, *Medical Records,* at 69.  Doc. No. 34-3, *Requests and Grievances,*

at 4.  The grievance was marked "not grievable" by Michael Hagerty the same day,

and then closed by Taylor.  *Id.*

Taylor continued to receive pain medication and other medical care, but there

is no record that he complained about his shoes again before filing this lawsuit on

December 19, 2022.  *See* Doc. No. 34-4, *Medical Records,* at 21-22, 40-65, 82-83.

### *Scott's Affidavit*

Scott provided an affidavit.  Doc. No. 34-6.  She explained that from April

2022 through March 2023, she was a sergeant at the PCRDF in the Inmate Services

Department.  *Id.* at ¶¶ 1-2.  Scott did not recall ever seeing or talking to Taylor in

person or having any communications with him in writing and did not communicate

with him about his medical condition.  *Id.* at ¶¶ 3, 5.  She did not review or respond

to any of his requests of grievances (and would not normally do so in her role as sergeant). *Id.* at ¶ 4. Scott explained that Taylor had access to medical care through Turn Key Health, she did not interfere with his medical treatment, she was not present at his medical visits, was not made aware of his medical condition, and did not have access to his medical records. *Id.* at ¶¶ 6-8, 13.

Scott further explained that staff in the Inmate Services Department reviewed "Medical Classification Communication" forms submitted by Turn Key Health personnel to determine if a requested item, such as shoes, were within policy and permitted within the housing inmate units. *Id.* at ¶ 9. She stated that her signature on such forms meant that she received the forms, not that she necessarily reviewed or approved of the shoes in question. *Id.* Scott understood a form stating that an inmate "may have shoes from property if approved," meant that the inmate may have the shoes from their property if the shoes complied with the safety and security requirements of the facility, as determined by the Inmate Services Department. *Id.* at ¶ 10.

According to Scott, clerks or deputies working with the Inmate Services Department were responsible for reviewing an inmate's shoes to determine if they were safe to wear in the inmate housing units. *Id.* at ¶ 11. She explained that the personnel performing this task would not be informed of an inmate's medical condition or diagnosis, but would simply review the shoes to determine if they

complied with the facility's safety and security regulations. *Id.* at ¶ 12. Scott stated that she generally did not perform this task. *Id.* at ¶ 11. She said that Taylor's Nike Air Jordans were reviewed and determined to be unpermitted within the facility; she recalled communicating this determination to Turn Key Health personnel. *Id.* at ¶¶ 14-15. Scott further explained that reviewing an inmate's shoes and providing a "yes" or "no" response was her only role; she did not provide medical judgment or analysis, was not made aware of an inmates' medical condition or any other circumstances warranting an exception from the facility's normal rules and regulations. *Id.* at ¶¶ 17-18.

According to Scott, Nike Air Jordans were not permitted at the PCRDF because an inmate wearing Nike Air Jordans within an inmate housing unit could be a target and susceptible to attack by other inmates. *Id.* at ¶ 27. She further explained that policy:

> dictated that inmate shoes be as uniform as possible to reduce safety and security risks. Uniformity is important in a detention facility setting. A lack of uniformity can cause an inmate to become the target of an attack, creating a safety risk to the inmate. Shoes that create safety and security risks cannot be permitted within inmate housing units. For safety and security reasons, there were limitations placed on style, color, and brand name of shoe allowed within inmate housing units. Plain white shoes with Velcro were preferred. In addition, inmates were not permitted to have shoes from their property if the shoes had shoelaces rather than Velcro. This policy was also based on safety and security reasons, as shoelaces can be used as ligatures. Inmates could harm themselves or others with shoelaces.

*Id.* at ¶ 26.

Finally, Scott explained that in her role with the Inmate Services Department, she would not be the personnel responsible for procuring medical shoes for an inmate and would not have the necessary knowledge to do so. *Id.* at ¶ 22. She also stated that she was not involved in the decision to offer Taylor "Bob Barker" style boots and had no knowledge regarding that decision. *Id.* at ¶¶ 23-24.

### *Taylor's Responses to Interrogatories*

On April 19, 2023, Scott propounded Interrogatory No. 14 to Taylor, stating: "Please describe your shoes that you allege you were denied during your incarceration within PCRDF, including the brand, style, color, whether the shoes had laces, and where you originally purchased your shoes." Doc. No. 34-7, *Discovery Responses*, at 2. Taylor responded:

> The shoes that were removed from me on August 20, 2022 were Nike, Air Jordans, white in color, the shoes were leather, with laces, and a velcro strap designed to add added support to the ankle. These are generally designed for indoor used, such as a basketball court. Additionally these are ¾, high top shoes. These shoes were purchased originally from Foot Locker, North Little Rock.

*Id.* at 5.

In response to Scott's Interrogatory No. 15, stating: "Please list any communication you had with Sgt. Scott and the date of the communication. State the contents of any direct communication between you and Sgt. Scott." Doc. No. 34-7, *Discovery Responses*, at 2. Scott responded: "I never communicated directly to Sgt.

Scott in regards to the issue of my shoes. This is common in jail settings. The message was sent through medical staff, (Nicole Moore)." *Id.* at 5.

In response to Scott's Interrogatory No. 17, stating: "Describe in detail the boots you allege were provided by Sgt. Saunders. Please state the brand name, color, style, whether the shoe had laces, etc." Doc. No. 34-7, *Discovery Responses*, at 3. Taylor responded:

> The boots that were brought to me were Bob Barker, black work boots, these boots are leather, with 6" leather uppers (high tops). The boots had laces (approx 7 lace holes). The soles are oil resistant, hard rubber, aggressive foot tread. These boots are designed for work in an outdoor setting. These boots are issued to the maintenace inmates at PCRDF.

*Id.* at 12.

In response to Scott's Interrogatory No. 18, stating: "Please provide any evidence that Sgt. Scott provided you with the aforementioned "boot." Doc. No. 34-7, *Discovery Responses*, at 3. Taylor responded:

> See medical-sick call dated 11-8-2022, (number 29878561). Nichole Moore states that the medical records reflect the fact that "boots" were provided to me. I also have a witness James Hall that was in the unit the day that the boots were actually brought into the unit by Sgt Sanders. Nichole also states that the provider talked to the "housing Sgts." about the "shoes". In speaking to Nichole directly I was informed that Sgt Scott is over housing and the person that made the decision to not allow my shoes into the unit and supply me with the heavy combat style work boot.

*Id.* at 6.

## IV.  Analysis

### *A.      Individual Capacity Claims*

Scott argues that she is entitled to qualified immunity with respect to Taylor's claims against her in her individual capacity because he cannot establish a constitutional violation. Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Qualified immunity is a question of law and is appropriately resolved on summary judgment. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015).  Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Pretrial detainees' claims are evaluated under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment.  *See Hartsfield v. Colburn*,

371 F.3d 454, 457 (8th Cir. 2004). Pretrial detainees are entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment. *See id.* (citing *Spencer v. Knapheide Truck Equip. Co.,* 183 F.3d 902, 906 (8th Cir. 1999)); *see also Davis v. Hall,* 992 F.2d 151, 152–53 (8th Cir. 1993) (per curiam) (applying deliberate indifference standard to pretrial detainee's claims of inadequate medical care).[3] To succeed with an Eighth Amendment inadequate medical care claim, a plaintiff must allege and prove that: (1) he had objectively serious medical needs; and (2) prison officials subjectively knew of, but deliberately disregarded, those serious medical needs. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). Additionally, the Eighth Circuit has held that a "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).

The evidence in this record does not establish that Scott was deliberately indifferent to Taylor's serious medical needs, specifically his need for the Nike Air

---

[3] In *Spencer,* the Eighth Circuit explained that it had never articulated an exact standard for evaluating medical treatment claims brought by pretrial detainees. 183 F.3d at 905. The Court acknowledged that pretrial detainees' claims may be subject to an objective reasonable test rather than the subjective deliberate indifference standard. *Id.* The Eighth Circuit addressed this issue again in *Bailey v. Feltmann*, 810 F.3d 589, 593 (8th Cir. 2016), where it declined to address the proper constitutional standard unnecessarily, but noted that when that case was decided it was not clearly established that a pre-trial detainee was entitled to more protection than that provided by the Eighth Amendment.

Jordans he brought with him into the facility.  There is no evidence in the record showing that Scott was involved in Taylor's medical care in any way, or that she ever reviewed or responded to any of his grievances.  Taylor acknowledges that he never spoke directly to Scott about his shoes or made her aware of his medical condition.  The record shows, and Scott maintains, that her only involvement was to communicate to Turn Key medical personnel her determination that Nike Air Jordans were not allowed under PCRDF policy.  Even assuming Taylor had a serious medical need for the Nike Air Jordans in his property, or even an orthopedic shoe, there is no evidence that Scott was aware of such a need, let alone deliberately indifferent to it.  Her limited involvement precludes liability on her part.  *See Mayorga v. Missouri,* 442 F.3d 1128, 1132 (8th Cir. 2006) ("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.") (internal quotations and citations omitted).  Without any evidence indicating Scott was involved in Taylor's medical care or denied his request for his shoes with knowledge of a serious medical need for them, she is entitled to summary judgment.

## B.    *Official Capacity Claims*

Scott is also entitled to judgment in her official capacity.  Official capacity claims are "functionally equivalent to a suit against the employing governmental entity."  *Veach v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010).

Thus, a suit against a defendant in his official capacity is in essence a suit against the County or city itself.  *See Murray v. Lene*, 595 F.3d 868 (8th Cir. 2010); *Liebe v. Norton*, 157 F.3d 574 (8th Cir. 1998).  A municipality cannot be held liable on the basis of *respondeat superior*, or simply by virtue of being the employer of a tortfeasor.  *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201 (8th Cir. 2013).  Accordingly, Scott, as a county employee, can only be held liable in her official capacity in this case if Taylor can establish that a constitutional violation was committed pursuant to "an official custom, policy, or practice of the governmental entity."  *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009).  Taylor has not alleged that his failure to receive appropriate shoes were caused by an unconstitutional policy or custom of Pulaski County.  Scott is therefore entitled to judgment as a matter of law in her official capacity.

## V.  Conclusion

Scott's motion for summary judgment (Doc. No. 32) is granted.  Judgment is awarded in her favor, and Taylor's claims are dismissed with prejudice.

DATED this 24th day of March, 2025.

_____
UNITED STATES MAGISTRATE JUDGE